**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**COLUMBUS DIVISION**

| | | |
|---|---|---|
| J.N.C.G., | : | |
| | : | |
| Petitioner, | : | |
| | : | |
| v. | : | CASE NO. 4:20-CV-62-MSH |
| | : | 28 U.S.C. § 2241 |
| Warden, STEWART DETENTION | : | |
| CENTER, *et al.*, | : | |
| | : | |
| Respondents. | : | |

_____

## <u>ORDER</u>

Pending before the Court is Petitioner's application for a writ of habeas corpus pursuant to 28 U.S.C. § 2241 (ECF No. 1). For the reasons explained below, Petitioner's application is granted in part and denied in part.

## BACKGROUND

Petitioner is a native and citizen of El Salvador who has lived in the United States since March 13, 2001, when he entered the country as a lawful permanent resident at the age of eight. Resp'ts' Ex. A, at 1, 4, ECF No. 13-2. His conduct in this country has not been exemplary. In 2012 and 2013, he was convicted of misdemeanor possession of marijuana, and in February 2017, the Department of Homeland Security ("DHS") served him with a Notice to Appear ("NTA"), charging him with removability based on these convictions. Bretz Decl. ¶¶ 30, 32, 34, ECF No. 13-1; Resp'ts' Ex. A, at 3; Resp'ts' Ex. B, at 3, ECF No. 13-3. He was held in United States Immigration and Customs Enforcement ("ICE") custody until June 8, 2017, when an immigration judge ("IJ")

cancelled his removal.  Bretz Decl. ¶¶ 35-36; Resp'ts' Ex. C, at 1, ECF No. 13-4.

On February 5, 2018, Petitioner was convicted in Virginia of petit larceny and misdemeanor assault. Bretz Decl. ¶ 37.  He received a sentence of twelve months imprisonment on the petit larceny charge and a twelve-month suspended sentence on the assault charge.  Resp'ts' Ex. A, at 6.  On January 10, 2019, he was convicted in Virginia of felony eluding police under Va. Code Ann. § 46.2-817(B), felony hit-and-run under Va. Code Ann. § 46.2-894, driving under the influence under Va. Code Ann. § 18.2-266, and probation violation under Va. Code Ann. § 19.2-306.  Bretz Decl. ¶ 38; Resp'ts' Ex. A, at 5-6; Pet. Ex. A, at 2, ECF No. 1-8.  He was sentenced to a total of approximately ten years in prison, but he did not serve any time for the convictions.[1]  Resp's' Ex. A. at 5-6; Pet. Ex. A, at 2.  On April 3, 2019, DHS issued a second NTA charging Petitioner with removability.  Resp'ts' Ex. D, ECF No. 13-5.  He was taken into ICE custody on April 4, 2019, and has remained in their custody since then.  Bretz Decl. ¶ 40.  His detention is mandatory under 8 U.S.C. 1226(c).

On July 31, 2019, an IJ ordered Petitioner's removal under 8 U.S.C. § 1227(a)(2)(A)(ii) due to two convictions for crimes involving moral turpitude ("CIMT").  Pet. Ex. D, at 11, ECF No. 1-11  The two crimes identified by the IJ as CIMTs were (1) the February 5, 2018, Virginia conviction for petit larceny, and (2) the January 10, 2019,

---

[1]  In his original petition, Petitioner asserted he served twelve months and five days on the state charges.  Pet. ¶ 62, ECF No. 1.  In their response, Respondents contended Petitioner served no time, but was taken into ICE custody instead.  Resp'ts' Resp. to Pet. 10, ECF No. 13.  At oral argument, Petitioner's counsel stated she had determined that his incarceration was for other charges.

Virginia conviction for felony eluding police.  *Id.* at 2, 11.  The IJ rejected DHS's argument that the January 10, 2019, conviction for felony hit-and-run also constituted a CIMT.  *Id.* at 4-6.  On August 28, 2019, Petitioner appealed to the Board of Immigration Appeals ("BIA").  Pet. Ex. E, at 1, ECF No. 1-12.  He did not challenge the petit larceny conviction's characterization as a CIMT, but he did challenge the felony eluding conviction.  Pet. Ex. G, at 5 n.1, 8-27, ECF No. 1-14.  DHS did not cross-appeal, but in its response brief, it argued that both felony eluding *and* felony hit-and-run were CIMTs.  Pet. Ex. H, at 8-14, ECF No. 1-15.  On October 24, 2019, Petitioner filed a statement of new legal authorities, attaching the BIA decision in  *In re Matter of Ramirez Moz*, AXXX XXX 892 (BIA Sept. 19, 2019), which concluded that a Virginia conviction for felony eluding under Va. Code Ann. § 46.2-817(B) did not constitute a CIMT.  Pet. Ex. J, at 4, 6-7, ECF No. 1-17.  On May 4, 2020, DHS filed a motion to expedite decision with the BIA.  Resp'ts' Ex. G, at 1, ECF No. 13-8.  On June 9, 2020, Petitioner also filed a motion to expedite.  Pet'r's Reply Ex. A, at 3-4, ECF No. 17-1.  Nevertheless, the BIA has still not issued a ruling.

Petitioner filed his application for habeas relief (ECF No. 1) on April 3, 2020. Petitioner contends his detention has become unreasonably prolonged in violation of the Fifth Amendment Due Process Clause.  Pet. ¶¶ 78-82, ECF No. 1.  As relief, he requests the Court order his release or, in the alternative, order Respondents to provide him with an individualized bond hearing at which the Government bears the burden of proving his continued detention is justified.  *Id.* at p. 26.  Respondents filed a comprehensive response (ECF No. 13) to the petition on June 12, 2020.  Petitioner submitted a reply brief (ECF No. 17) on June 19, 2020.  The Court heard oral argument on June 24, 2020, and subsequently

received supplemental briefing from the parties (ECF Nos. 18, 21). Both parties have consented (ECF No. 10) to all proceedings being conducted by the United States Magistrate Judge, including the entry of a final judgment directly appealable to the Eleventh Circuit Court of Appeals pursuant to 28 U.S.C. § 636(c)(3). This case is ripe for review.

## DISCUSSION

### I.     Prolonged Detention

#### A.     *Sopo*

Petitioner contends his detention has become unreasonably prolonged and that he is entitled to a bond hearing under *Sopo v. United States Attorney General*, 825 F.3d 1199 (11th Cir. 2016), *vacated on other grounds*, 890 F.3d 952 (11th Cir. 2018). Pet. ¶¶ 38-70. In *Sopo*, the Eleventh Circuit applied the canon of constitutional avoidance to conclude there was an implicit temporal limitation against unreasonably prolonged detention without a bond hearing of criminal aliens detained under 8 U.S.C. § 1226(c). *Sopo*, 825 F.3d at 1214. In determining whether a criminal alien's due process rights have been violated, the Court rejected a bright-line rule and, instead, adopted a case-by-case approach for district courts to follow, noting that "reasonableness, by its very nature, is a fact-dependent inquiry requiring an assessment of all circumstances of any given case." *Id.* at 1215 (quotation marks omitted). The Court identified five factors for courts to consider. *Id.* The first was the length of detention, with the Court suggesting that "a criminal alien's detention may often become unreasonable by the one-year mark, depending on the facts of the case." *Id.* at 1217. The second factor was a consideration of "why the removal proceedings have become protracted." *Id.* at 1218. The Court noted that while criminal aliens should not be

4

"punished for pursuing avenues of relief and appeals," district courts should consider whether the alien has "sought repeated or unnecessary continuances" or acted in bad faith to delay proceedings.  *Id.*  The Court also identified three other factors: whether removal of the criminal alien would be possible once a removal order became final, whether the civil detention period exceeded the time the alien spent in prison for the crime rendering him removable, and whether the facility where he was detained was "meaningfully different from a penal institution for criminal detention."  *Sopo*, 825 F.3d at 1218.  Finally, the Court stated its list was "not exhaustive" and that the factors to be considered would vary depending on the facts of each case.  *Id.*

Although *Sopo* was vacated, and its constitutional avoidance rationale rejected by the Supreme Court in *Jennings v. Rodriguez*, --U.S.--, 138 S.Ct. 830, 842 (2018), district courts in the Eleventh Circuit have continued to cite it as persuasive authority on due process claims for prolonged detention.  *See, e.g., Msezane v. Garland*, No. 5:19-cv-51, 2020 WL 1042293, at *7 (S.D. Ga. Jan. 29, 2020) (collecting cases).  This is understandable, as the Eleventh Circuit's explanation of why the statute could pose constitutional concerns absent finding an implicit temporal limitation is suggestive as to how the Court would ultimately rule on an as-applied constitutional challenge to the statute.

Respondents contend the Court should not conduct a *Sopo* analysis for two reasons: (1) Petitioner failed to exhaust his administrative remedies, and (2) Petitioner's continued detention is authorized by § 1226(c) and *Demore v. Kim*, 538 U.S. 510 (2003).  Resp'ts' Suppl. Br. 1-6, ECF No. 21.  Neither argument is convincing.

### 1.    *Exhaustion*

Respondents contend Petitioner failed to exhaust his administrative remedies by requesting a *Joseph* hearing, referring to *In re Joseph*, 22 I. & N. Dec. 799 (BIA 1999). Resp'ts' Suppl. Br. 4-6.  In a *Joseph* hearing, a § 1226(c) detainee "may avoid mandatory detention by demonstrating that he is not an alien, that he was not convicted of the predicate crime, or that the [Immigration and Naturalization Service ("INS")] is otherwise substantially unlikely to establish that the detainee is in fact subject to mandatory detention."  *Demore*, 538 U.S. at 514 n.3 (2003).  Respondents assert that prior to filing his habeas application, Petitioner should have first requested a *Joseph* hearing before an IJ and then appealed an adverse decision to the BIA. Resp'ts' Suppl. Br. 5.

"While Section 2241 does not include a statutory exhaustion requirement, courts have generally required exhaustion as a prudential matter."  *Hossain v. Barr*, No. 6:19-cv-06389-MAT, 2019 WL 5964678, at *3 (W.D.N.Y. Nov. 13, 2019)  (internal quotation marks omitted); *see also Douglas v. Gonzalez*, No. 8:06-cv-890-T-30TGW, 2006 WL 5159196, at *2 (M.D. Fla. June 12, 2006) (requiring petitioner to await outcome of BIA appeal prior to seeking habeas relief).  However, since exhaustion is not statutorily required, the Court has some discretion in its application.  *McCarthy v. Madigan*, 503 U.S. 140, 144 (1992), *superseded by statute on other grounds as recognized in Porter v. Nussle*, 534 U.S. 516, 524 (2002).  Moreover, Respondents' exhaustion argument is a red herring.

Petitioner raised the issue of whether his felony eluding conviction qualifies as a CIMT—thus subjecting him to §1226(c) mandatory detention—before an IJ and is now waiting for the BIA to rule on his appeal of the IJ's adverse ruling.  Requiring him to make

the identical argument before an IJ in a *Joseph* hearing and then appeal the inevitable adverse ruling would be duplicative.  Moreover, he does not ask this Court to determine whether he has been properly classified as a § 1226(c) detainee; he admits that if his felony eluding conviction qualifies as CIMT, then he is subject to mandatory detention.  Pet'r's Suppl. Br. 2, ECF No. 18.  Instead, he challenges the constitutionality of the length of his detention while he awaits the BIA's ruling on his appeal.  The Court will not require Petitioner to remain detained while awaiting the BIA's ruling before allowing him to raise a constitutional challenge to the length of that detention, as such a requirement would verge on Orwellian.  True, if the BIA overrules the IJ's ruling, then, presumably, Petitioner will no longer be subject to mandatory detention and could possibly be released from custody.  However, such reasoning applies to most, if not all, appeals to the BIA.  If exhaustion were applied in the manner suggested by Respondents, pre-final-order-of-removal aliens would never be able to raise a due process challenge to the length of their detention because conceivably any favorable administrative ruling could result in their release.  But, as discussed below, due process places constraints on prolonged detention of § 1226(c) detainees.  Thus, the Court finds that Petitioner's claims are not barred for failure to exhaust administrative remedies.

### 2.    *§ 1226(c) and Demore*

Respondents contend the Court need look no further than *Demore* and the particular facts of Petitioner's case to find his continued § 1226(c) detention is constitutional.  Resp'ts' Resp. to Pet. 6-8; Resp'ts' Suppl. Br. 1-4.  In *Demore*, the Supreme Court addressed a due process challenge to mandatory detention under § 1226(c).  538 U.S. at

514.  Pertinent to this case, the petitioner did not challenge whether *prolonged* detention under § 1226(c) was constitutional but, instead, whether *any* period of mandatory detention was constitutional.  Lower courts had concluded that the statute was unconstitutional as applied because the Government "had not provided a justification 'for no-bail civil detention sufficient to overcome a lawful permanent resident alien's liberty interest.'"  *Id.* at 515 (quoting *Kim v. Ziglar*, 276 F.3d 523, 535 (9th Cir. 2002)).

In overruling those lower courts, the Supreme Court discussed the legislative history behind the enactment of § 1226(c).  It noted that "Congress adopted this provision against a backdrop of wholesale failure by the INS to deal with increasing rates of criminal activity by aliens."  *Id.* at 518.  The Court cited findings that "[c]riminal aliens were the fastest growing segment of the federal prison population, already constituting roughly 25% of all federal prisoners, and they formed a rapidly rising share of state prison populations as well."  *Id.*  In 1990, it cost $724 million to confine criminal aliens.  *Id.*  Further, the Court observed that "deportable criminal aliens who remained in the United States often committed more crimes before being removed," with one study showing "77% were arrested at least once more and 45%—nearly half—were arrested multiple times before their deportation proceedings even began."  *Id.*  Studies showed that it would take 23 years at the then-current rate of deportation to remove every criminal alien subject to deportation, and one major cause was INS's failure to detain them during deportation proceedings.  *Demore*, at 518, 519.  While the Attorney General had "broad discretion" regarding bond, "severe limitations on funding and detention space" meant that "in practice," release decisions were affected by considerations other than flight risk or dangerousness.  *Id.* at

8

519.  Finally, more than 20% of deportable criminal aliens who were released did not appear for their removal hearings.  *Id.*

After discussing this background, the Court observed that "[i]n the exercise of its broad power over naturalization and immigration, Congress regularly makes rules that would be unacceptable if applied to citizens."  *Id.* at 521 (quoting *Mathews v. Diaz*, 426 U.S. 67, 79-80, (1976)). Further, the Court noted that it had long "recognized detention during deportation proceedings as a constitutionally valid aspect of the deportation process."  *Id.* at 523. "Such detention," the Court stated, "necessarily serves the purpose of preventing deportable criminal aliens from fleeing prior to or during their removal proceedings, thus increasing the chance that, if ordered removed, the aliens will be successfully removed."  *Id.* at 528.  Thus, the Court held that "[d]etention during removal proceedings is a constitutionally permissible part of that process."  *Id.* at 531.

Citing the legislative history outlined in *Demore* and the purposes served by § 1226(c), Respondents ask the Court to find that the continued detention of Petitioner does not violate due process.  Resp'ts' Suppl. Br. 2.  They cite his criminal history—particularly his 2018 conviction for misdemeanor petit larceny following the IJ's 2017 cancellation of removal—to argue that he is "exactly the type of individual that concerned Congress when enacting § 1226(c)."[2]  *Id.*  In essence, Respondents contend *Demore* provides the only framework the Court needs to analyze Petitioner's claim, and they cite no case law other

---

[2]  To the extent Respondents suggest that the Court should consider Petitioner's entire criminal history in finding that he is the sort of individual Congress envisioned in mandating detention under § 1226(c)—as opposed to only those crimes subjecting him to mandatory detention under this section—the Court disagrees.

than *Demore* to support their position.

Problems arise if the Court relies solely on *Demore*.  For one, the majority opinion never discussed prolonged detention.  In fact, the majority opinion referred to the "brief" or "limited" period of mandatory detention of criminal aliens.  *Demore*, 538 U.S. at 513, 526, 531.  It also cites statistics at the time showing that mandatory detention lasted "roughly a month and a half in the vast majority of cases in which it is invoked, and about five months in the minority of cases in which the alien chooses to appeal."  *Id.* at 530.  How the majority would treat someone like the Petitioner—who has been detained for over 16 months—is not clear.  In an oft-cited concurring opinion, Justice Kennedy stated that a "lawful permanent resident alien . . . could be entitled to an individualized determination as to his risk of flight and dangerousness if the continued detention became unreasonable or unjustified."  *Id.* at 532 (Kennedy, J., concurring).

Moreover, relying solely on *Demore* would seemingly place criminal aliens in a black hole.  If a criminal alien is subject to mandatory detention under § 1226(c), he or she is, by definition, "exactly the type of individual that concerned Congress when enacting § 1226(c)."  Taken to its logical conclusion, Respondents' reasoning would allow immigration officials to delay proceedings for years without violating the detained alien's due process rights because the alien would always be the sort of person for whom mandatory detention was intended under § 1226(c).  The alternative would be to ask this Court to ignore the statutory criteria for § 1226(c) detention and ask if a particular criminal alien is *really* who the statute meant to keep detained.

Respondents' *Demore*-oriented approach, however, does find some support in case

law.  In *Mohamed v. Secretary of the Department of Homeland Security*, 376 F. Supp. 3d 950, 956 (D. Minn. 2018), the district court concluded that it could "no longer simply rely" on cases applying the doctrine of constitutional avoidance to analyze due process challenges to § 1226(c).  376 F. Supp. 3d at 956.  Instead, the district court concluded that the "petition must rise or fall based on what this court can glean from *Demore*, and on its best judgment of the constitutional issue raised by [petitioner]." *Id.*.  The district court then applied a "fact-based individualized standard" to determine the constitutionality of the petitioner's continued detention.  *Id.* at 957.  The district judge concluded that the petitioner—who had been detained for 15 months—was entitled to a bond hearing before an IJ.  *Id.* at 957-58.

*Mohamed* was cited with approval by the Southern District of Florida in *Mehmood v. Sessions*, No. 18-cv-21095-Scola, 2018 WL 10760347, at *20 (S.D. Fla. Nov. 28, 2018), *recommendation adopted as modified by* 2019 WL 8892625 (S.D. Fla. Jan. 29, 2019). There, the district court determined that *Sopo*'s "reasoning is mostly compromised" in light of *Jennings*.  *Mehmood*, 2018 WL 10760347, at *18.  Therefore, the district court adopted a standard from *Demore* that considered the length of the delay, who was to blame for the delay, and—citing Justice Kennedy's concurrence—"'whether the detention is not to facilitate deportation, or to protect against risk of flight or dangerousness, but to incarcerate for other reasons.'"  *Id.* at *20-21 (quoting *Demore*, 538 U.S. at 531-33 (Kennedy, J., concurring)).

What stands out in *Mohamed* and *Mehmood* is that while both look to *Demore*, they adopt standards remarkably similar to *Sopo*.  Moreover, both cases cite decisions relying

on the constitutional avoidance doctrine in their analyses of the factors a district court should consider. *Mohamed*, for example, cited *Reid v. Donelan*, 819 F.3d 486 (1st Cir. 2016) and *Ly v. Hansen*, 351 F.3d 263 (6th Cir. 2003). *Mohamed*, 376 F. Supp. 3d at 957-58. Meanwhile, despite deeming *Sopo* "mostly compromised," *Mehmood* relied, at least partially, on that decision in analyzing the petitioner's due process claim. *Mehmood*, 2018 WL 10760347, at *22-23. This makes sense as *Sopo* itself relied heavily on *Demore* in identifying the factors a district court should consider in deciding whether a criminal alien's detention has become unreasonably prolonged. *Sopo*, 825 F.3d at 1217-18.

The only meaningful difference between *Mohamed* and *Mehmood* is that while *Mohamed* delegated to the IJ a consideration of flight risk or dangerousness, *Mohamed*, 376 F. Supp. 3d at 958, the district court in *Mehmood* decided those were factors it should consider in analyzing whether a constitutional violation has occurred. *Mehmood*, 2018 WL 10760347, at *23. Similarly, Respondents appear to urge the Court to engage in such gatekeeping role by making a factual determination that Petitioner is a flight risk or danger to the community. Resp'ts' Suppl. Br. 2. However, if other relevant factors show that a criminal alien's detention has become unreasonable, the Court believes such determination is best made by an IJ conducting an individualized bond hearing. In fact, the magistrate judge in *Mehmood* acknowledged that this determination "necessarily bears on the issue that would come up at an individualized bond hearing," but concluded it was appropriate for the district court to decide the matter because if the petitioner was a substantial risk of flight or danger to the community, no constitutional error would occur in denying him a "hopeless" bond hearing before an IJ. *Mehmood*, 2018 WL 10760347, at *23 n.34.

Significantly, the petitioner in *Mehmood* had a criminal history of stealing identities to obtain travel documents, removing a GPS transmitter bracelet to escape while on pretrial supervision, and stealing his wife's car while leaving behind notes indicating his intent to flee to his native country of Pakistan. *Id.* at \*23-24.  The district court concluded that the "[p]etitioner's risk of flight is so unusually great that it defies logic as to why he filed this habeas petition at all." *Id* at \*24.  Even if the Court were to assume a similar gatekeeping role in this case, Petitioner's criminal history is not so stark as to bar him from even pleading his case before an immigration judge.[3]

For these reasons, the Court concludes that Petitioner's as-applied due process challenge is best analyzed using the factors outlined in *Sopo*, which, although only persuasive authority, provides useful guidance in evaluating prolonged § 1226(c) detention.  In other words, the Court does not agree with Respondents that "*Demore* resolves the issue here."  Resp'ts' Resp. to Pet. 7.  Instead, the Court must address a situation that is very different than the "brief" or "limited" detention presumed by the majority in *Demore*, but is, instead, more akin to the prolonged detention that was only a hypothetical in Justice Kennedy's concurrence.  *Demore*, obviously, is the starting point, but the Court must go further to determine whether Petitioner's 16 months of detention without an individualized bond hearing comports with due process.

B.    Application of the *Sopo* Factors

Applying the *Sopo* factors, the first—length of detention—weighs decidedly in

---

[3]    The Court agrees Petitioner's criminal history is not insignificant—not all of which is summarized here—and it would expect the IJ to consider that in an individualized bond hearing.

13

Petitioner's favor.  He has now been detained for over 16 months.  This is well beyond the one-year presumptively unreasonable period identified in *Sopo*.  825 F.3d at 1217.

The second factor is an evaluation of why removal proceedings have been protracted.  *Id.* at 1218.  Again, this factor weighs heavily in Petitioner's favor.  Petitioner appealed to the BIA nearly a year ago, filed his initial brief on October 11, 2019, and submitted his supplemental brief on October 24, 2019.  Pet. Ex. E, at 2; Pet. Ex. G, at 28; Pet. Ex. J, at 4.  DHS filed its brief, which was two weeks overdue, on October 31, 2020.  Pet. Ex. H, at 15.  The BIA has still not rendered a decision despite both parties having moved for an expedited decision.  Resp'ts' Ex. G, at 1; Pet'r's Reply Ex. A, at 3-4.  Moreover, based on the BIA decision concluding that a Virginia conviction for felony eluding did not constitute a CIMT, Petitioner has—at the very least—pursued a good faith, non-frivolous argument.  Thus, it does not appear that Petitioner is in any way to blame for the delay, and instead, the blame rests entirely on the Government.  *See Sopo*, 825 F.3d at 1218 ("Errors by the immigration court or the BIA that cause unnecessary delay are also relevant."); *see also Martinez v. Clark*, No. C18-1669-RAJ-MAT, 2019 WL 5968089, at *10 (W.D. Wash. May 23, 2019) (attributing delay caused by crowded immigration court docket to the government); *Chikerema v. Lowe*, No. 1:18-CV-1031, 2019 WL 3928930, at *8-9 (M.D. Pa. May 2, 2019) (attributing BIA delay to the government); *Sajous v. Decker*, No. 18-CV-2447 (AJN), 2018 WL 2357266, at *11 (S.D.N.Y. May 23, 2018) (rejecting ICE's argument that delay by the immigration court should not be attributable to it and noting that "where the fault is attributable to some entity other than the alien, the factor will weigh in favor of concluding that continued detention without a bond hearing is

14

unreasonable").

The third factor is whether removal will be possible once the removal order becomes final. *Sopo*, 825 F.3d at 1218. At oral argument, Respondents' counsel represented to the Court that there would be no impediment to Petitioner's removal to El Salvador once a removal order became final, and Petitioners have not challenged this assertion.[4] Thus, this factor weighs in Respondents' favor.

The fourth factor is "whether the alien's civil immigration detention exceeds the time the alien spent in prison for the crime that rendered him removable." *Id.* As previously discussed, it appears Petitioner was not actually detained for the crimes subjecting him to § 1226(c) mandatory detention. Respondents contend the Court should look at his total sentence—11 years in prison—as opposed to his actual period of confinement. Resp'ts' Resp. to Pet. 10. However, they cite no law to support this, and *Sopo*, itself, referred to "the time the alien spent in prison for the crime that rendered him removable." *Sopo*, 825 F.3d at 1218. Thus, this factor weighs in Petitioner's favor.

Fifth, and finally, neither party disputes that Petitioner's current place of confinement—Stewart Detention Center—is not meaningfully different from a prison.

Both parties direct the Court to *Sopo's* admonition that its "list of factors is not exhaustive," and point to other factors they believe should be considered. *Id.* Petitioner

---

[4] Petitioner asserts this factor is similar to another consideration mentioned in *Sopo*: whether removal proceedings will conclude in the reasonably foreseeable future. Pet. ¶ 56; *Sopo*, 825 F.3d at 1218. The Court disagrees that they address the same concern. Whether removal proceedings will conclude in the reasonably foreseeable future is unknown. If the BIA rules in Petitioner's favor, they could obviously conclude quite soon. Otherwise, Petitioner indicates he may appeal. Pet. ¶ 59.

asks the Court to consider the risk posed by Covid-19 in immigration detention.  Pet. ¶¶ 67-70.  However, the Court lacks jurisdiction to grant habeas relief for a conditions of confinement claim arising from the risk of Covid-19 at Stewart Detention Center.  *A.S.M. v. Warden, Stewart Cty. Det. Ctr.*, No. 7:20-cv-62-CDL-MSH, 2020 WL 2988307, at *4 (M.D. Ga. June 3, 2020).  Thus, it will not consider this as a factor.  Respondents ask the Court to consider the entirety of Petitioner's criminal history.  Resp'ts' Suppl. Br. 3.  Again, however, this is best addressed by the IJ in an individualized bond hearing.

In summary, four of the five *Sopo* factors weigh in Petitioner's favor.  Therefore, the Court concludes he is entitled to an individualized bond hearing before an IJ.[5]  The Court will next consider the burden of proof and procedures to be applied in such a hearing.

## II.   Bond Hearing

Having primarily relied upon *Sopo* in arguing for a bond hearing, Petitioner asks the Court to disregard it when it comes to the burden of proof.  Citing out-of-circuit case law, Petitioner contends the Government should bear the burden of proving Petitioner's dangerousness or risk of flight by a preponderance of the evidence.  Pet. ¶¶ 71-75.  The Court disagrees.  *Sopo* squarely addressed the burden of proof for bond hearings granted to a § 1226(c) detainee and placed it on the criminal alien.  825 F.3d at 1220.  The Eleventh Circuit noted that to do otherwise would be to "give criminal aliens a benefit that non-criminal aliens do not have."  *Id.*  The Eleventh Circuit recognized "that by the time a

---

[5] Petitioner included release from custody in his prayer for relief.  Pet. at p. 26.  *Sopo*, however, did not authorize this, and the consensus is that ordering a bond hearing is the appropriate remedy when the length of detention has become unreasonable.  *See Maldonado v. Macias*, 150 F. Supp. 3d 788, 811-12 (W.D. Tex. 2015) (collecting cases).

criminal alien becomes eligible for a bond hearing, he has already experienced a lengthy detention," but that was because "Congress enacted the mandatory detention statute in § 1226(c), a statutory approach that comparatively disadvantages aliens who commit crimes over law-abiding aliens in removal proceedings." *Id.* Citing *Sopo*, another district court in this circuit concluded that placing the burden of proof on a § 1226(c) detainee did not violate due process. *Lukaj v. McAleenan*, 420 F.Supp.3d 1265, 1276 (M.D. Fla. 2019), *vacated on other grounds by* No. 3:19-cv-241-J-34MCR, 2020 WL 248724 (M.D. Fla. Jan. 16, 2020).

Therefore, the Court **ORDERS** that Respondents provide Petitioner an individualized bond hearing before an IJ within fourteen (14) days. The procedures set forth in 8 C.F.R. § 1236.1(c) applicable to non-criminal aliens shall be followed, and Petitioner may appeal an adverse decision to the BIA under the procedures outlined in § 1236.1(d). The BIA shall provide Petitioner with the same standard of review applicable to non-criminal aliens detained under 8 U.S.C. § 1226(a). Petitioner shall bear the burden of proving he is not a flight risk or danger to others.[6]

SO ORDERED, this 26th day of August, 2020.

/s/ Stephen Hyles
UNITED STATES MAGISTRATE JUDGE

---

[6] Petitioner also requests that the Court order the IJ to consider his ability to pay when setting a bond. Pet. at p. 26. An IJ may consider "any information that is available . . . or that is presented to him or her by the alien or" Respondents, and no regulation precludes an IJ from considering the alien's ability to pay bond or alternative conditions to release if this information is presented at the bond hearing. 8 C.F.R. § 1003.19(d). Moreover, ability to pay is only relevant if the IJ determines Petitioner is entitled to bond, which, at this point, is speculative.